IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 2, 2022

## STATE OF TENNESSEE v. ZACIARO MOORE

**Appeal from the Criminal Court for Shelby County**
**No. 18-03339          Chris Craft, Judge**

_____

### No. W2021-01352-CCA-R3-CD

_____

A Shelby County jury convicted the Defendant, Zaciaro Moore, of especially aggravated robbery, aggravated assault, and theft of property valued at more than $1,000. The trial court sentenced the Defendant to a total effective sentence of eighteen years. On appeal, the Defendant contends that the evidence was insufficient to support his conviction for especially aggravated robbery based upon the State's failure to prove the element of serious bodily injury. Following our review, we conclude that the evidence was sufficient to support the jury's verdict, and we affirm the Defendant's convictions. However, we must remand for a clerical error in the judgment form for theft of property in Count 3.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court**
**Affirmed and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which TIMOTHY L. EASTER, J., joined. JOHN EVERETT WILLIAMS, P.J., not participating.[1]

Phyllis Aluko, District Public Defender; William Johnson and Nigel Lewis (at trial); and Harry E. Sayle III (on appeal), Assistant District Public Defenders, Memphis, Tennessee, for the appellant, Zaciaro Moore.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jose Leon, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

_____

1 The Honorable John Everett Williams died September 2, 2022, and did not participate in this opinion. We acknowledge his faithful service to this Court.

# I. Background and Facts

This case arises from a domestic violence incident between the Defendant and the victim, with whom the Defendant was in a sexual relationship after meeting on a dating website. The Defendant stayed at the victim's home for several days until the victim asked him to leave, causing an argument during which the Defendant hit the victim in the head with a hammer. The victim sustained multiple head injuries and was hospitalized for several days. Sometime after their altercation, the Defendant drove away in the victim's vehicle and later returned to the victim's apartment, using the victim's keys to enter the unit and steal the victim's television. For these events, a Shelby County grand jury indicted the Defendant for attempted first-degree premeditated murder, especially aggravated robbery, and theft of property valued at more than $1,000.

The following evidence was presented at the Defendant's trial on these charges: The victim testified that he was forty-five years old and lived in an apartment in Memphis. He stated that on April 15, 2016, the Defendant attacked him with a hammer. The victim had known the Defendant for four days at that point, having met him on a dating website. The victim offered for the Defendant to come over and watch television at the victim's apartment. The victim's brother was scheduled to come into town for a visit, so at the end of the four days, the victim told the Defendant he needed to leave the apartment. The victim agreed that the Defendant had been sleeping, eating, and keeping his belongings at the victim's apartment during those four days.

The victim testified he returned to his apartment that evening after working all day. Upon his arrival, the victim told the Defendant about his brother's visit and asked the Defendant to leave. The Defendant replied that he had no place to go. The victim went to bed, but was awakened by the Defendant in the middle of the night asking if he could stay. The victim told the Defendant that they would discuss it in the morning. Then, the Defendant "took the hammer from behind his back" and "bashed [the victim] in the head" with it while the victim lay in bed. The victim said that the Defendant "cracked [his] skull" and that he lost consciousness, though the victim was unsure for how long. When the victim regained consciousness, he observed the Defendant rifling through his pants and looking through his wallet. The Defendant took the victim's debit card from his wallet. The victim followed the Defendant out of the bedroom, feeling "disoriented." The victim went into his guest bedroom to look at himself in the mirror and was hit from behind by the Defendant. The victim lost consciousness again. When the victim roused, the Defendant was still trying to hit him with the hammer and threatened to kill him. The victim slid behind a door so that the Defendant would not hit him anymore. The victim testified that he managed to push the Defendant off of him.

2

The victim testified that he had multiple skull fractures and lacerations on his face from the attack. He also said that he had defensive fractures in his thumb and elbow from trying to block the hammer hits. The victim asserted that he did not attack or charge the Defendant in any way.

After the Defendant left, the victim noticed that his cell phone and computer were missing and that his television was missing from the wall. The victim opined that the Defendant stole his things while he was unconscious. The Defendant drove away in the victim's car, a white 2004 Pontiac Grand Prix with an Arkansas license plate. The victim went to his neighbor's apartment and asked him to call the police. Law enforcement arrived, and the victim recounted the events briefly before being transported to the hospital. The victim told law enforcement that the Defendant might be at Summer Trace Apartments, a nearby apartment complex, where the victim had picked the Defendant up four days before.

The victim was in the hospital for six days and underwent a thirty-hour surgery. The victim's medical records were entered into evidence. Following his release from the hospital, the victim identified the Defendant as his attacker in a photographic lineup.

The victim identified photographs taken of his injuries immediately following the altercation, which were shown to the jury. The victim said that he had a scar on his face and scars on the back of his head, which he displayed to the jury. The victim also pointed out a hole on the left side of his head in one photograph.

In addition, the victim identified photographs of his apartment's interior, including his bedroom where the bulk of the attack occurred and where there was a large amount of blood on the bed. The victim further identified photographs of his television, his vehicle, his computer, the bloody hammer used to attack him, and his cell phone. The hammer, computer, and cell phone were found in the woods behind the victim's apartment.

When the victim's car was returned to him following the Defendant's apprehension, the victim later traded it in for $1500. A bill of sale was entered into evidence reflecting the transaction.

On cross-examination, the victim acknowledged that the website on which he met the much younger Defendant was used to arrange sexual encounters. The Defendant asked if he could spend the night and wash his clothes at the victim's apartment, and the victim agreed. The victim denied knowing that the Defendant was homeless until the Defendant told him that he had no place to stay. According to the victim, the Defendant stayed four nights total while the victim went to work during the day. The victim recalled that they slept in the same bed and had sexual intercourse twice. According to the victim,

3

when he sat in his neighbor's apartment talking to the police, he was barely able to communicate and had lost a lot of blood at that time. The victim also said that he subsequently tested negative for HIV.

John Valentine testified that the victim knocked on his door during the late evening or early morning hours of April 15, 2016, and that he let the victim inside after seeing that the victim was "bleeding pretty badly from the head." Mr. Valentine got the victim a towel for his head. The victim told Mr. Valentine that he had been attacked and asked him to call the police.

Lashondia Williams testified that on April 15, 2016, the Defendant came to her apartment to sell her a television. According to Ms. Williams, the Defendant was not injured, bruised, or bleeding at that time. Ms. Williams went with the Defendant to a white vehicle with the television in the trunk, and as the Defendant was loading the television into Ms. Williams's vehicle, the police arrived. The Defendant fled with Ms. Williams's cell phone in his hand and left the victim's car keys inside Ms. Williams's car.

Patrick Taylor testified that he worked for the Memphis Police Department ("MPD") and responded to a call at the victim's apartment complex on April 15, 2016. He found the victim sitting in a neighbor's apartment with multiple injuries to his head and face and bleeding profusely. Officer Taylor photographed the victim's injuries. Officer Taylor proceeded to the victim's nearby apartment where he photographed the scene. Officer Taylor described that the apartment was in disarray and that "large amounts of blood" were seen in various areas of the apartment, which indicated to Officer Taylor that some kind of struggle had taken place. Officer Taylor confirmed that when he spoke with the victim, the victim was lucid and responsive. The victim also provided answers to a multitude of questions and supplied specific information pertaining to the incident.

Information provided by the victim led Officer Taylor to the Summer Trace apartment complex. Once inside the complex, Officer Taylor found a white Pontiac sedan with an Arkansas license plate parked close to a dumpster; the vehicle was identified as belonging to the victim. After speaking with a man "on the back stoop of one of the apartments," Officer Taylor turned around and went in search of a white Dodge Avenger he had passed coming into the complex. At the other end of the same street, Officer Taylor located the Dodge Avenger, which had the trunk open with a flat screen television sticking out of the back. While trying to ascertain the Dodge Avenger's owner, Ms. Williams approached the officers. Officer Taylor made contact with Ms. Williams and learned that the Defendant was in possession of Ms. Williams's cell phone.

Contact was made with the Defendant, and Officer Taylor spoke with the Defendant very briefly before passing the phone to another officer on the scene. According to Officer

4

Taylor, two police cars were sent to apprehend the Defendant at the location the Defendant had provided, but it turned out that the Defendant had given "a false address." While Officer Taylor was still on the scene compiling his paperwork, the Defendant "appeared" in the apartment complex and was arrested. According to Officer Taylor, the Defendant was compliant when he was apprehended, and the Defendant did not appear to have any visible injuries at that time.

MPD Officer Sammy Batts testified that he responded to the call at the victim's apartment complex on April 15, 2016, between the hours of 4:00 and 5:00 a.m. When Officer Batts arrived at the victim's apartment, he observed the victim "with several lacerations, cuts on his head." Shortly thereafter, Officer Batts accompanied Officer Taylor to the Summer Trace apartment complex. After Officer Taylor initiated contact with the Defendant via Ms. Williams's cell phone, Officer Taylor passed Officer Batts the phone, and Officer Batts remained on the phone speaking with the Defendant throughout the encounter. Eventually, the Defendant came out of one of the apartments and was arrested. Officer Batts said that the Defendant appeared "to be fine" at that time and was not in need of medical assistance.

MPD Crime Scene Investigator John Stone testified that he arrived at the victim's apartment at approximately 4:50 a.m. to take photographs. Investigator Stone testified that he observed several rooms inside the apartment where blood was present. Investigator Stone believed that "some sort of struggle had taken place." When shown a picture of the bed, Investigator Stone said that there was blood on the headboard, which was consistent with blunt-force trauma. Investigator Stone also saw blood on the pillow and comforter of the bed and "more castoff spatter that hit the wall." In addition, Investigator Stone observed blood in the bathroom around the basin of the sink and castoff spatter on the wall of another bedroom.

The twenty-three-year-old Defendant testified that he had been homeless since he was teenager due to ongoing abuse in his household. According to the Defendant, he was at Ms. Williams's apartment on April 8, 2016, when he started talking with the victim over a dating website. After the victim came and picked the Defendant up from Ms. Williams's place, they went back to the victim's apartment where they watched movies, talked, and eventually had consensual sex. According to the Defendant, he stayed with the victim for eight days, and the victim forced him to engage in sex every single day. The Defendant indicated that the victim knew he was homeless and would threaten to kick him out if he did not have sex.

The Defendant testified that on the evening of the altercation, he found a piece of paper from a clinic indicating that the victim was positive for HIV. According to the Defendant, when he confronted the victim about the test result, the victim started yelling

5

and cussing and began to choke him. The Defendant stated that he was lying on the bed pinned down by the victim, so he grabbed the hammer from the nightstand and began hitting the victim with the hammer in self-defense. The Defendant further asserted that he only took the victim's belongings out of anger because he felt upset and used. The Defendant returned to Ms. Williams's apartment after leaving the victim's place.

The Defendant confirmed that he gave the police a written statement admitting that he hit the victim with the hammer. The Defendant explained, "Because I wanted to tell what happened, and I wanted to tell them why it happened."

On cross-examination, the Defendant said that the victim was never unconscious during the altercation. The Defendant indicated that he was not injured in the fight, other than being choked. In addition, the Defendant denied providing the officers with a false address and asserted that "he came right on out" of Ms. Williams's apartment when asked to do so by the officers.

Relative to the victim's television, the Defendant said that he merely inquired of Ms. Williams's boyfriend how much it was worth and if he knew of a potential buyer. The Defendant did not deny that he placed the television in Ms. Williams's car. The Defendant also admitted that he disposed of the cell phone, computer, and hammer by throwing them into the woods behind the victim's apartment.

In the Defendant's police statement, he told the police that he waited until "the situation was cool, calm, and collected" before he hit the victim ten times in the head. The Defendant indicated that he stopped hitting the victim once the victim fell to the floor. The Defendant told the police that he attacked the victim because the victim had put his hands on the Defendant first and because the Defendant believed that the victim had given him HIV. In addition, the Defendant indicated to the police that "[t]he plan was for [him] to get the tv and leave." According to the Defendant, the police embellished certain parts of the Defendant's statement, and he just went along with it.

In rebuttal, the State called MPD Sergeant Andrew Bishop, who testified to the circumstances surrounding the Defendant's police statement. Sergeant Bishop testified that upon the Defendant's arrival at the police station, the Defendant requested medical attention because he was bleeding and had an injury to his ankle. After the Defendant was "checked over" and was "cleared," the Defendant waived his *Miranda* rights. Sergeant Bishop described the Defendant as coherent and articulate during the interview. Sergeant Bishop averred that he did not make up any of the details included in the Defendant's statement and that the Defendant had a chance to review and correct his statement. The statement was entered into evidence.

Based on this evidence, the jury convicted the Defendant of aggravated assault as a lesser-included offense of attempted first-degree murder, especially aggravated robbery, and theft of property valued at more than $1,000.   The trial court held a sentencing hearing and imposed an effective eighteen-year sentence to be served at one-hundred percent.   It is from these judgments that the Defendant now appeals.

## II. Analysis
## A.  Sufficiency of the Evidence

On appeal, the Defendant contends that the evidence was insufficient to support his conviction for especially aggravated robbery.   Specifically, he contends that the trial court erred when it denied his motion for judgment of acquittal based upon the State's failure to prove the element of serious bodily injury.[2]   The State initially responds that this court should waive the Defendant's argument because his notice of appeal was untimely.   The State further submits that the proof was more than sufficient for a rational jury to find beyond a reasonable doubt that the victim suffered serious bodily injury.   We agree with the State that the evidence was sufficient to support proof of serious bodily injury.

First, we have determined that the notice of appeal was timely filed in accordance with Rule 4(a) of the Tennessee Rules of Appellate Procedure.   A notice of appeal must be filed "within [thirty] days after the date of entry of the judgment appealed from."   Tenn. R. App. P. 4(a).   The trial court's order denying the Defendant's motion for new trial was filed on October 8, 2021.   The Defendant, thereafter, had thirty days to file a notice of appeal.   *See* Tenn. R. App. P. 4(c).   According to the rules of time computation, the Defendant's notice of appeal was due on November 8, 2021.   *See* Tenn. R. App. P. 21(a).

Rule 20(a) of the Tennessee Rules of Appellate Procedure provides that "[f]iling shall not be timely unless the papers are received by the clerk within the time fixed for filing or mailed to the office of the clerk by certified return receipt mail or registered return receipt mail within the time fixed for filing."   The State observes that the Defendant's notice of appeal bears a filing date of November 16, 2021, and that there was no notation on the notice of appeal that it was received via certified mail.   However, despite this initial clerical error, the notice was in fact mailed via certified mail on November 4, 2021, and the mailing envelope in the appellate court file clearly reflected such.   Thus, the appellate court clerk corrected the Defendant's notice of appeal to reflect that it was mailed via certified mail on November 4, 2021.   Accordingly, the Defendant's notice of appeal is timely, and we will proceed to review the sufficiency of the evidence.

---

[2] The Defendant does not challenge on appeal his convictions for aggravated assault or theft.   We note that the Defendant's aggravated assault conviction, as charged in this case, also required proof that the victim suffered serious bodily injury.   *See* T.C.A. § 39-13-102(a)(1)(A)(i).

7

Initially, we observe that the Defendant phrases his argument in terms of challenging the trial court's denial of his motion for judgment of acquittal at the end of the State's proof. "The standard by which the trial court determines a motion for a judgment of acquittal is, in essence, the same standard that applies on appeal in determining the sufficiency of the evidence after a conviction." *State v. Little*, 402 S.W.3d 202, 211 (Tenn. 2013). A motion for judgment of acquittal is waived if the defendant introduces proof after making the motion, and the appellate court merely analyzes the sufficiency of all evidence. *Finch v. State*, 226 S.W.3d 307, 316-17 (Tenn. 2007). In this case, the Defendant introduced proof after the State rested its case, and accordingly, the Defendant's challenge is simply one to the sufficiency of the evidence.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

8

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

As relevant to this case, especially aggravated robbery requires the State to prove a robbery that was "(1) [a]ccomplished with a deadly weapon; and (2) [w]here the victim suffer[ed] serious bodily injury." T.C.A. § 39-13-403(a). "Robbery" is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). "Serious bodily injury," as relevant here, is defined as "bodily injury that involves: (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; [or] (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]" T.C.A. § 39-11-106(a)(34); *see also State v. Farmer*, 380 S.W.3d 96, 100-01 (Tenn. 2012). Whereas, "[b]odily injury" is defined to include "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." T.C.A. § 39-11-106(a)(2).

Here, the Defendant challenges the element of serious bodily injury. The Defendant contends that his actions did not involve a substantial risk of death because the victim's "medical records alone do not evaluate the degree" to which the victim's injuries presented a substantial risk of death and because an expert witness did not testify to this effect. He also submits that there "was no testimony or other evidence" that the victim experienced protracted unconsciousness, noting that the victim could not say how long he was rendered unconscious and that the lapses appeared to be only momentary. Next, the Defendant observes that the victim did not testify that he experienced extreme physical pain and that the victim's medical records indicated that he only reported above moderate

pain on four occasions. The Defendant further asserts that there was no proof of protracted or obvious disfigurement, citing that the victim did not elaborate "as to the size or description" of the scars sufficiently to distinguish them from "simple disfigurement." Finally, the Defendant contends that there was no proof of protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty. For all of these reasons, the Defendant surmises that the State's proof did not rise to the level of serious bodily injury.

The State contends that there was sufficient evidence of serious bodily, noting that the victim spent six days in the hospital and underwent thirty hours of surgery; that the victim showed the jury scars on his head and face that he still bore years later; and that the jury saw pictures of the dents and cuts the hammer left around the victim's skull immediately following the incident, including one particular round indentation that was quite deep. The State also submits that the victim's medical records were sufficient and that medical expert testimony was not required. In addition, the State observes that the victim was unconscious at least long enough for the Defendant to unmount a television from the wall and begin stealing other items; that the victim's medical records indicated that he described his pain as "aching, crushing" and that, at its worst, it "was 10 out of 10 on a pain scale"; that the medical records referred to the pain management the victim required both during and after his hospital stay; and that the medical records stated that part of the victim's ear was amputated. For these reasons, the State concludes that all five categories of serious bodily injury were supported by the proof at trial.

The distinction between "bodily injury" and "serious bodily injury" is generally a question of fact for the jury and not one of law. *State v. Barnes*, 954 S.W.2d 760, 765-66 (Tenn. Crim. App. 1997). "Protracted" in the context of serious bodily means "'delayed or prolonged in time.'" *State v. Ronald L. Carroll*, No. E2013-01781-CCA-R3-CD, 2014 WL 1759101, at *5 (Tenn. Crim. App. Apr. 30, 2014) (quoting *State v. Derek Denton*, No. 02C01-9409-CR-00186, 1996 WL 432338, at *5 (Tenn. Crim. App. Aug. 2, 1996)).

While the complexity of medical records and the need for the assistance of an expert to explain those records was pointed out in the concurring opinion in *Farmer*, *see* 380 S.W.3d at 103-05 (Koch, J., concurring), the Defendant cites to no authority, and we know of none, actually requiring medical testimony. *See State v. Joshua Hurt*, No. E2020-00236-CCA-R3-CD, 2021 WL 1329460, at *7 (Tenn. Crim. App. Apr. 9, 2021) (finding sufficient proof to support the element of serious bodily injury based upon the introduction of medical records only, and rejecting the defendant's argument "that his actions did not cause a substantial risk of death because no one testified to this effect"), *perm. app. denied* (Tenn. July 14, 2021). In fact, Justice Koch highlighted in his concurring opinion that "[u]ndoubtedly, there are circumstances in which a juror's 'common-sense understanding' will be sufficient to enable a juror to determine whether a particular injury involves a

substantial risk of death[.]"  *Id.* at 104 (footnote omitted); *see also State v. William Heath*, No. W2015-01837-CCA-R3-CD, 2016 WL 6135519, at *3 (Tenn. Crim. App. Oct. 21, 2016).  We think this to be such a case.

Based upon its verdict, the jury clearly found that the injuries the victim suffered as a result of his being hit in the head and face with a hammer multiple times by the Defendant were sufficient to establish the element of serious bodily injury.  The victim testified that he spent six days in the hospital for his injuries and that he underwent a thirty-hour surgery while there.  The victim's medical records indicated that he suffered "depressed skull fractures" and required a craniectomy.  The jury saw pictures of the victim's apartment and of the victim's injuries that were taken immediately following the incident.  The victim also displayed to the jury the scars on his face and head that were still present years later.  The jury accredited the victim's testimony and the evidence, as was within its province.  We conclude that these facts were sufficient to support a finding that the victim's injuries involved a substantial risk of death and led to protracted or obvious disfigurement.  *See State v. Deonte Matthews*, No. M2010-00647-CCA-R3CD, 2012 WL 5378046, at *4 (Tenn. Crim. App. Oct. 31, 2012) ("When confronted with the issue of whether a permanent scar is sufficient for a jury to find 'protracted or obvious disfigurement' . . . , this court has consistently determined that it is." (collecting cases)); *State v. Thomas J. Tackett*, No. M1999-02541-CCA-R3-CD, 2001 WL 721852, at *3 (Tenn. Crim. App. June 28, 2001) (finding that the evidence demonstrated a substantial risk of death where the victim lost significant quantities of blood, suffered a skull fracture, was hospitalized for a total of ten days for his injuries and a resultant infection, and had deep cut wounds to his head that required one hundred staples to repair).

We need only find one of the factors in support of serious bodily injury to uphold the jury's verdict.  Accordingly, the evidence was sufficient to support the Defendant's conviction for especially aggravated robbery, and he is not entitled to relief on this issue.

### B. Theft Offense Classification

The judgment form in Count 3 reflects that the Defendant was sentenced to two years as a Range I, standard offender for Class D felony theft.  We note that the Defendant was indicted for theft of property valued at more than $1,000 but less than $10,000, which was a Class D felony at the time of the offense, but the theft grading statute had reclassified theft of property valued at over $1,000 but less than $2,500 to a Class E felony by the time the Defendant was sentenced in 2021.  *See* T.C.A. § 39-14-105(a)(3) (2015); 2016 Tennessee Laws Pub. Ch. 906 § 5 (eff. date Jan. 1, 2017).  Tennessee Code Annotated section 39-11-112, the savings statute, applies to reduce the punishment for theft offenses committed prior to the change in the law when sentencing takes place after the law has

gone into effect. *State v. Menke*, 590 S.W.3d 455, 468, 469 n.12 (Tenn. 2019); *see* T.C.A. § 39-11-112.

Here, relative to the Defendant's theft of property conviction, the State relied upon the Defendant's taking of the victim's car, and the jury fixed the value of the victim's property at more than $1,000. At trial, the victim testified that his vehicle was worth $1,500 when he traded it in, and he provided a bill of sale for that transaction. At the sentencing hearing, the trial court indicated that it was sentencing the Defendant for Class E felony theft and noted that the Defendant had a prior history of thefts before imposing a two-year sentence. Thus, it appears that the trial court was aware of the savings statue and imposed a corresponding sentence. Consequently, we can confidently say that the error in the judgment notating a Class D felony conviction was simply a clerical error. The case is remanded for entry of corrected judgment form in Count 3 to reflect the appropriate Class E felony classification associated with the Defendant's theft offense.

### III. Conclusion

In accordance with the foregoing, we affirm the judgments of the trial court. However, as noted in this opinion, we remand the case for entry of a corrected judgment form in Count 3.

_____
ROBERT W. WEDEMEYER, JUDGE